[Tagged]



**ORDERED in the Southern District of Florida on October 11, 2013.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

In re:                                              Case No.11-17929-BKC-EPK

WILLIAM A. NESBITT,                       Chapter 7

       Debtor.
_____/
DEBORAH C. MENOTTE, TRUSTEE

       Plaintiff,
v.                                                  Adv. No. 12-01378-EPK

SENNORA BROWN,
C&P GROUP, LLC
CLEAR TITLE AMERICA, LLC
RACHMAS CAPITAL,
KEYES REAL ESTATE, and
LOREAL MCDONALD

      Defendants.
_____/

### <u>MEMORANDUM OPINION</u>

THIS MATTER came before the Court for trial on May 28, 2013, upon the *Adversary*

*Complaint*  [ECF No. 1] (the "Complaint") filed by Deborah C. Menotte, Trustee (the

"Trustee" or the "Plaintiff") of the chapter 7 bankruptcy estate of Debtor, William A. Nesbitt.

The Complaint contains twenty counts. The Trustee settled the claims against The Keyes Company (sometimes called Keyes Real Estate) and Loreal McDonald [Case No. 11-17929, ECF Nos. 142 and 145]. The Court entered default final judgments against Sennora Brown [ECF No. 114], C&P Group, LLC [ECF No. 116], and Rachmas Capital [ECF No. 166]. At the time of trial the only remaining defendant was Clear Title America, LLC ("Clear Title" or the "Defendant"). The Trustee proceeded against Clear Title on Counts VI (Common Law Fraud), XI (Fraud in the Inducement), XVI (Conspiracy to Commit Fraud), and XX (Punitive Damages).

At trial, the Court granted the Defendant's motion for judgment on partial findings with regard to Count XVI, pursuant to Fed. R. Civ. P. 52(c), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. The Trustee neither presented evidence on nor argued for punitive damages and thus abandoned Count XX. The Court will enter judgment in favor of the Defendant on Counts XVI and XX.

 The Court considered the testimony of witnesses, the documentary evidence admitted at trial, and the post-trial briefs filed by the parties. This Memorandum Opinion presents the Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. P. 7052, on Counts VI and XI. For the reasons below, the Court will enter judgment in favor of the Defendant on Counts VI and XI. Consequently, the Trustee is accorded no relief against Clear Title.

**FINDINGS OF FACT**

William A. Nesbit (the "Debtor") filed a voluntary petition for relief under chapter 13 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"), on March 25, 2011. The case was converted to a chapter 7 proceeding on April 22, 2011.

On the petition date, the Debtor owned a large single family residence located at 9294 Hawk Shadow Lane, Delray Beach, Florida (the "Real Property").   The Real Property was encumbered by a first mortgage in favor of American Home Mortgage Servicing, Inc. ("American Home") in the amount of $9,600,000, and a second mortgage in favor of Bank of America, NA in the amount of $1,200,000.  American Home was in the process of foreclosing its mortgage lien on the Real Property.  After investigation, the Trustee concluded that there was no equity in the Real Property for the estate.  However, the Trustee determined that the household goods and furnishings located at the residence (the "Personal Property") were significant assets available to liquidate for the benefit of creditors in this chapter 7 case.

Rather than remove the Personal Property from the Real Property to pursue a sale of the Personal Property on its own, the Trustee determined that a sale of the Personal Property along with the Real Property would lead to a greater recovery for the estate.  The Trustee worked diligently with the two mortgage lien holders and the homeowners' association, which also held a lien on the Real Property, to facilitate a possible short sale of the Real Property in tandem with a sale of the Personal Property.  In late 2011, the Trustee received approval from the lien holders for a short sale.  Unfortunately, that first transaction did not come to fruition.

The Trustee continued to market the Real and Personal Property together in early 2012.  The Trustee had received several written offers, copies of which were admitted at trial as Plaintiff's Exhibit 7 and Plaintiff's Exhibits 14 through 17, inclusive.  After evaluating the offers, the Trustee entered into a contract (the "Contract") for the sale of the Real and Personal Property to defendant C&P Group, LLC ("C&P").   A copy of the Contract was admitted as Plaintiff's Exhibit 7.

3

The Contract indicates a purchase price of $3,400,000 for the Real Property and includes a separate addendum for sale of the Personal Property for $200,000. The closing date was to be January 30, 2012. A Short Sale Addendum, incorporated into the Contract, provides that if the Trustee did not obtain written short sale approval from the lien holders by January 30, 2012, then C&P was not obligated under the Contract and any earnest money, if paid, was to be returned to C&P.

In light of the impending foreclosure by American Home, the Trustee sought this Court's approval for the sale of the Property to C&P on an emergency basis. On January 26, 2012, the Court approved the sale of the Real Property and Personal Property to C&P under the terms of the Contract.

While the Trustee was involved in continuous negotiation with American Home, Bank of America and the homeowners' association, the Trustee did not have written short sale approval from these parties on January 30, 2012. However, based on her communications with the lien holders, and in light of the fact that the same lien holders had not long before approved a short sale of the Real Property under less favorable terms than the C&P Contract, the Trustee believed she would obtain written short sale approval from the lien holders to permit a closing with C&P, albeit not within the time frame set out in the Contract.

As the short sale approval deadline approached, based on communications with the parties' real estate agents, the Trustee became concerned that C&P and its principal, defendant Sennora Brown, were not moving forward with the transaction under the Contract. On February 1, 2012, two days after the short sale approval deadline under the Contract, the Trustee received from Ms. Brown, via the parties' real estate agents, a copy of a letter (the "Escrow Letter") from Clear Title dated February 1, 2012. The Escrow Letter was admitted as Plaintiff's Exhibit 2. The Escrow Letter states that Clear Title is in receipt

4

of a check in the amount of $390,000[1] as the deposit for the sale to C&P and provides the internal file number assigned by Clear Title to the earnest money deposit.  The Escrow Letter is signed by Gary R. Alderman, II, the Chief Operating Officer of Clear Title.  When forwarding the Escrow Letter, Ms. Brown made no mention of the passage of the short sale approval deadline in the Contract.  The Trustee received the Escrow Letter as an indication that C&P intended to move forward with the purchase of the Real and Personal Property. At least as of February 1, 2012, the evidence leads one to believe that C&P intended to purchase the Real and Personal Property as originally agreed.

Mr. Alderman confirmed at trial that Clear Title in fact never received a deposit from C&P.  Mr. Alderman testified that he provided the Escrow Letter to Sennora Brown as an example upon Ms. Brown's request.  The Court did not find this testimony credible.  The Escrow Letter delivered to the Trustee identifies the sale contemplated in the Contract.  It is signed by Mr. Alderman.  There is no notation or other hint on the Escrow Letter that it was considered an example.  Indeed, the Escrow Letter includes an internal file number for the subject transaction.  Mr. Alderman was unable to explain why he would have issued such a complete document with the intent that it be used only as an example of an escrow letter.  Mr. Alderman testified that at a later time he voided the copy of the Escrow Letter kept in Clear Title's files.  The voided version of the Escrow Letter was also admitted at trial.  The word "VOID" is stamped across Mr. Alderman's signature and the document is

---

[1] At trial, the Defendant argued that because the Escrow Letter states a deposit amount of $390,000 and the deposit provision in the Contract was a lesser amount, $340,000, the Trustee should have questioned the Escrow Letter.  The Trustee testified that she often receives deposits from prospective purchasers, with or without a contract, and that by delivery of the Escrow Letter from C&P she understood that the stated amount was intended as a good faith deposit supporting their interest in acquiring the Real and Personal Property.  The Court found this testimony credible not only because the Trustee was believable but because it is the Court's experience that deposits are often tendered in connection with potential sales of estate assets even without a contract.  In any case, whether the Trustee was justifiable in her reliance on the Escrow Letter is not material to the present case because only the Trustee's actual reliance is required under Florida law (see below).

annotated with the text "Executed contract and check not received" and the date "2/3/12". This voided version of the Escrow Letter was not provided to anyone prior to the present litigation.  Mr. Alderman was unable to explain why he would bother to mark a sample document "void" in his own files but never inform anyone that the document provided to Ms. Brown was not intended to be what it appeared, a confirmation of receipt of escrow funds.

The evidence before the Court leads to the inescapable conclusion that the Escrow Letter was intended to—and did—represent falsely that Clear Title held an earnest money deposit in escrow.[2]  By delivering the Escrow Letter, Clear Title intended to cause the seller of the Real and Personal Property to believe there was earnest money backing the transaction.

The Escrow Letter refers to the Debtor, William Nesbitt, as the "seller."  In spite of his testimony to the contrary, the evidence shows that Mr. Alderman knew at or about the time he produced the Escrow Letter of the involvement of the Trustee in the proposed transaction with C&P.  Nevertheless, it does not matter whether Clear Title's false statement was specifically aimed at the Trustee or at Mr. Nesbitt.  From the evidence as a whole, it is obvious that the Escrow Letter was produced to be provided to the seller of the Real and Personal Property, whoever that might be, and Clear Title intended to deceive the seller by representing that it held a deposit that it did not in fact have.  That the Trustee was the seller, rather than Mr. Nesbitt, is not material for purposes of this case.

---

[2] It is unclear why Clear Title would provide this obviously false written representation.  The evidence suggests that Ms. Brown came to Mr. Alderman from a regular referral source, and that Mr. Alderman thought he might be involved in multiple transactions with Ms. Brown.  In his deposition, a transcript of which was admitted as Plaintiff's Exhibit 1, Mr. Alderman suggests he believed Ms. Brown was sending the deposit.  In the end, however, the Court need not conclude why Mr. Alderman sent the Escrow Letter as motive is not a necessary element of the claims presented here.

Approximately a week after receiving the Escrow Letter the Trustee learned that the transaction with C&P was unlikely to move forward. This is apparent in correspondence between counsel for the Trustee and counsel for C&P admitted as part of Plaintiff's Exhibit 9.

The following week, on February 14, 2012[3], the Trustee learned that Clear Title did not in fact hold a deposit from C&P in connection with the Contract. For purposes of this case, it is important to note that the Trustee was under the mistaken belief that Clear Title held a deposit from C&P for only 14 days, from February 1 to February 14, 2012.

The Trustee testified credibly that if she had not received the Escrow Letter, showing that Clear Title held a significant deposit backing the C&P transaction, she would have pursued another contract for sale of the Real and Personal Property. As noted above, the evidence includes offers from several potential purchasers, each in the form of a purchase agreement as is the custom in South Florida. In addition, the Trustee testified that there were a number of other parties who had viewed the Real and Personal Property.

One offer that the Trustee expressed particular interest in was that of Land Banker's, Inc. Their initial proposal was admitted as Plaintiff's Exhibit 15. It stated a purchase price of $3,300,000 for the Real and Personal Property, together. While the opening offer of Land Banker's, Inc. included a lengthy due diligence period, the Trustee informed Land Banker's, Inc. that the closing would need to happen quickly and Land Banker's, Inc. had thereafter inspected the Real Property, thereby exhibiting their continued interest. Unlike with the C&P Contract, the Land Banker's, Inc. proposal did not include a separate addendum covering the sale of the Personal Property. It did include a

---

[3] It is unclear whether the Trustee learned there was no deposit on February 12, February 13, or February 14, 2012. There is conflicting evidence on the actual date. For purposes of this opinion the Court selects February 14, 2012 as the date the Trustee learned the Escrow Letter was false. If the actual date was February 12 or February 13, 2012, this would have no impact on the Court's decision.

7

provision stating: "Buyer to pay $100,000 to U.S. Bankruptcy Court." One can only assume this was intended to allocate to the bankruptcy estate the value of Personal Property included in the proposed sale. There is no other provision in the Land Banker's, Inc. offer, or in other evidence, that would lead the Court to conclude that the Trustee could have obtained more than $100,000 for the estate from the Land Banker's, Inc. offer.

The sale contemplated in the Contract did not close. American Home foreclosed on the Real Property. As a result, the Trustee was forced to sell the Personal Property on its own. The auction sale of the Personal Property provided a return to the estate of $122,335.

Even if the Trustee had known there was no deposit held by Clear Title on February 1, 2012, there is no evidence to support the conclusion that the Trustee could have achieved a sale of the Real and Personal Property to another party in the limited time available. To begin with, there is no evidence that the Trustee vetted any bidder to determine whether they could close on such a transaction. The Trustee did not even state that she had confidence in any of the proposals she had received prior to February 1, 2012. She testified only that she would have pursued an alternative transaction, not that an alternative transaction would have closed or that the estate would have received anything in particular as a result of any such alternative transaction. To put it plainly, the evidence presents no causal link between Clear Title's misrepresentation, a deceit that lasted only 14 days, and the Trustee's inability to sell the Real and Personal Property to another party.

Even if any of the offers admitted into evidence could have resulted in a sale in the limited time available prior to foreclosure, there is no evidence that the estate would have obtained a greater recovery than the Trustee actually obtained from the auction sale of the Personal Property. The Personal Property sold at auction for $122,335. The Land Banker's, Inc. contract appears to provide that the estate would receive $100,000 from the sale, some $22,000 less than the Trustee actually obtained from sale of the Personal

Property. The other proposals do not separately address the Personal Property, so it is unclear whether the estate would have received anything from those offers. Thus, even if the Court was convinced that the Trustee could have sold the Real and Personal Property to one of the parties identified in the offers admitted into evidence, there is no evidence that the estate was damaged by the Trustee instead being forced to auction the Personal Property. In fact, it appears that the estate had a better recovery from the auction sale than would have been obtained under those purchase offers.

Although the Trustee testified that she would have pursued an alternative sale of the Real and Personal Property, she did not present the damages to the estate by comparing the actual amount obtained from the auction sale of the Personal Property to any such alternative transaction. Instead, she stated the estate's damages by comparison to what the estate might have obtained had the sale closed under the C&P Contract. Of the $240,346.17 in total claimed damages, $77,655 is attributable to the difference between the auction sale proceeds actually received from the Personal Property and the amount that was to be paid for the Personal Property under the C&P Contract. As discussed more fully in the Court's analysis, below, it is not appropriate in a claim against Clear Title to measure damages by reference to a failed contract to which it was not a party. Even if it was, it was obvious that the C&P Contract would never have closed and, perhaps more importantly, that the Contract was not enforceable against C&P itself. The stated damage of $77,655 is a fiction as it does not represent any actual damage to the estate.

The Trustee's damages presentation includes $120,000 comprising two $60,000 amounts that would have been paid to the second mortgage holder and the homeowners' association under the C&P transaction. These amounts were to be paid to such lien holders from closing proceeds under the Contract, by agreement of American Home, to obtain their

9

consent to the short sale.  There is no evidence that the estate is liable to pay these amounts.  The $120,000 does not represent damage to the estate.

The Trustee claims auction sale expenses of $6,800.  As there is no evidence that the estate had any alternative but to sell the Personal Property at auction, such expenses were to be incurred in any case and thus do not represent damages to the estate.

The remainder of the requested damages is for attorneys' fees and costs.  The Trustee's affidavit, admitted at Plaintiff's Exhibit 13, and the Trustee's brief comments during her testimony, are the only evidence in connection with the Trustee's claim of damages in the form of legal fees and costs.  Based on the Trustee's testimony, it appears that most if not all of the claimed amount includes legal fees and costs in connection with the present action.  It also appears that the claimed attorneys' fees and costs may include work done in connection with the auction sale of the Personal Property.  The evidence does not include any detail for the claimed amounts, in the form of attorney time sheets or the like.

**ANALYSIS**

The Trustee brings claims for common law fraud and fraud in the inducement. Under the facts of this case, the two claims are essentially the same.  The Trustee must show: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it, and (4) consequent injury by the party acting in reliance on the representation.  *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quotation omitted).  Justifiable reliance is not a necessary element of the fraud claims presented here. *Id.*  The Trustee need prove only that she actually relied on the misrepresentation.  The Trustee must prove fraud by a preponderance of the evidence. *Bush v. Balfour Beatty Bahamas, Ltd. (In re Bush)*, 62 F.3d

1319, 1323 n.4 (11th Cir. 1995) (*citing Watson Realty Corp. v. Quinn*, 452 So. 2d 568 (Fla. 1984)).

The Trustee met her burden on most of the elements of her claims. The evidence shows that the Escrow Letter provided by Mr. Alderman represented falsely that Clear Title held a sizeable deposit in connection with the C&P Contract, a fact material to the proposed transaction. Clear Title knew that the Escrow Letter was false, that it did not in fact hold any earnest money. By delivering the Escrow Letter to the seller Clear Title intended to induce the seller to rely on the representation that a deposit was in hand. The Trustee relied on the Escrow Letter by continuing to pursue a transaction with C&P when she would have otherwise pursued a different transaction.

Fatally, however, the Trustee did not prove that the estate was damaged by C&P's false representation.

One possible theory of damages to the estate is that if the Trustee had known on February 1, 2012, when she received the Escrow Letter, that Clear Title in fact did not hold a deposit from C&P, the Trustee would have pursued a sale of the Real and Personal Property to another party which would have closed, resulting in a particular recovery to the estate on account of the value of the Personal Property. But the evidence does not support this approach. There is no evidence that the Trustee would have sold the Real and Personal Property to another party in the limited time prior to foreclosure. Even if she could have done so, there is no evidence that the estate would have recovered more than it actually did from the auction sale of the Personal Property. The Court cannot find that Clear Title's short-lived misrepresentation caused the estate to forego a more lucrative transaction.

The Trustee, however, did not present this theory of damages in her request for relief. Instead, the Trustee presented the damages to the estate by comparing the actual

11

recovery to the estate from the auction sale of the Personal Property to what the estate might have obtained had the sale closed under the C&P Contract. Where the defendant in a fraud action is the other party to the failed contract at the center of the claim, it is of course appropriate to measure damages against what the plaintiff would have obtained under such contract. But Clear Title was not a party to the Contract and should not be held to that bargain. In any case, by the Trustee's own admission C&P was not willing to pursue the transaction. Perhaps more importantly, because the Trustee was unable to obtain written short sale approval by January 30, 2012, the Contract was not enforceable. C&P had no obligation to move forward with purchase of the Real and Personal Property. If there had been a deposit paid by C&P, based on the evidence before the Court it would have been refundable. The C&P Contract is not an appropriate measure of potential damages in the Trustee's claims against Clear Title.

The Trustee claimed damages for the estate totaling $240,346.17. Of this amount, $77,655 is attributed to the difference between the auction sale proceeds actually received from the Personal Property and the amount that was to be paid for the Personal Property under the C&P Contract. As noted above, it is not appropriate to use the C&P Contract as a measure of damages.

The Trustee's damages presentation includes $120,000 comprising two $60,000 amounts that would have been paid from closing proceeds of the C&P transaction to the second mortgage holder and the homeowners' association in order to obtain their consent to the short sale. There is no evidence that the estate is liable to pay these amounts. The $120,000 does not represent damage to the estate.

The Trustee claims auction sale expenses of $6,800. As there is no evidence that the estate had any alternative but to sell the Personal Property at auction, such expenses were to be incurred in any case and thus do not represent damages to the estate.

12

Finally, the Trustee claims damage to the estate in the form of legal fees and costs. Based on the limited evidence before the Court, it appears that most, and perhaps all, of the claimed legal fees and expenses are attributable to the present action. The Trustee does not cite any agreement or statute that could give rise to a prevailing party right to fees and costs, and the Court is not aware of any basis for such a claim. Thus, no such relief is available here.

It is possible that, as a result of Clear Title's misrepresentation, the Trustee was forced to take action she otherwise would not have taken, apart from pursuing claims against Clear Title, and that such action necessitated incurring legal fees and costs. These expenses could constitute damage resulting from a misrepresentation. The claimed attorneys' fees and costs appear to include work done in connection with the auction sale of the Personal Property, which the Trustee claims was necessitated by Clear Title's misrepresentation. But the estate had no choice but to incur the auction related expenses and such are not damages caused by Clear Title's misrepresentation. Even if some component of the requested attorneys' fees and costs was shown to result from the Trustee's reliance on the Escrow Letter, there is no backup for the requested amount and so the Court cannot make any finding as to what portion, if any, could be recoverable. The Trustee did not meet her burden in showing that the stated attorneys' fees and costs constitute damage to the estate caused by Clear Title.

**CONCLUSION**

For the foregoing reasons, the Court will enter a separate judgment in favor of the Defendant as to Counts VI, XI, XVI and XX of the Complaint.

# # #

Copies furnished to:

All parties of record

13